1

2

3

4

5                    UNITED STATES DISTRICT COURT
              WESTERN DISTRICT OF WASHINGTON
6                            AT TACOMA

7    UNITED STATES OF AMERICA,          )   No.  3:16-cr-05110-RJB
                                        )
8              Plaintiff,               )   **ORDER ON DEFENDANTS' MOTION
                                        )   TO DISMISS INDICTMENT,
9         v.                            )   DEFENDANTS' MOTION TO
                                        )   SUPPRESS EVIDENCE, DEFENDANTS'
10                                      )   MOTION TO EXCLUDE EVIDENCE,
     DAVID TIPPENS,                     )   AND THIRD ORDER ON
11                                      )   DEFENDANTS' MOTION TO COMPEL
               Defendant.               )   DISCOVERY**
12   _____)

13   UNITED STATES OF AMERICA,          )   No.  3:15-cr-00387-RJB
                                        )
14             Plaintiff,               )   **ORDER ON DEFENDANTS' MOTION
                                        )   TO DISMISS INDICTMENT,
15        v.                            )   DEFENDANTS' MOTION TO
                                        )   SUPPRESS EVIDENCE, DEFENDANTS'
16                                      )   MOTION TO EXCLUDE EVIDENCE,
     GERALD LESAN,                      )   AND THIRD ORDER ON
17                                      )   DEFENDANTS' MOTION TO COMPEL
               Defendant.               )   DISCOVERY**
18   _____)

19   UNITED STATES OF AMERICA,          )   No.  3:15-cr-00274-RJB
                                        )
20             Plaintiff,               )   **ORDER ON DEFENDANTS' MOTION
                                        )   TO DISMISS INDICTMENT,
21        v.                            )   DEFENDANTS' MOTION TO
                                        )   SUPPRESS EVIDENCE, DEFENDANTS'
22                                      )   MOTION TO EXCLUDE EVIDENCE,
                                        )   AND THIRD ORDER ON
23   BRUCE LORENTE,                     )   DEFENDANTS' MOTION TO COMPEL
                                        )   DISCOVERY**
24             Defendant.               )
     _____)

25        THIS MATTER comes before the Court on three motions filed by Defendant David

26   Tippens, Defendant Gerald Lesan, and Defendant Bruce Lorente (collectively, "Defendants"):

ORDER
(*United States v. Tippens, et al.*) - 1

(1) Defendants' Motion to Dismiss Indictment (Dkt. 32[1]), (2) Defendants' Motion to Suppress Evidence (Dkt. 35), and (3) Defendants' Motion to Exclude Evidence (Dkt. 31). Also before the Court are unresolved discovery matters of Defendants' Motion to Compel. *See* Dkts. 54, 73, 78, 80, 81, 90. The Court has considered the parties' responsive briefings and supplements thereto (Dkts. 54, 56, 58, 61, 62, 64, 74, 75, 77, 86, 92, 96, 98, 100, 101, 104, 105), evidence and oral argument presented at public hearings held on October 31, 2016 and November 1, 2016  and at an *in camera* hearing held on October 31, 2016 (*see transcript*, Dkts. 102, 103), pleadings filed pursuant to Classified Information Procedures Act (CIPA) 18 U.S.C. App. 3 §§2 and 4 (Dkts. 86, 92, 95), and the remainder of the file herein.[2]

# I.     BACKGROUND

## A.  Website A

On February 19, 2015, with the authorization of a warrant issued pursuant to 18 U.S.C. § 2510 *et seq.*, the FBI took control of Website A, a website "dedicated" to child pornography, and relocated the site to a government server in Newington, Virginia. The site had more than 100,000 registered member accounts and 1,500 daily visitors. Dkt. 37-1 at ¶¶6, 11, 19. According to an FBI affiant, the homepage, which required users to login to proceed, featured "prepubescent females partially clothed and whose legs are spread with instructions for joining the site before one can enter." *Id.* ¶10. The homepage was changed to feature one youthful female before the warrant was issued, but after the affidavit was prepared.

---

[1] Docket numbers refer to *United States v. Tippens*, 3:16-cr-05110-RJB, except where otherwise noted. Defendant Lesan and Defendant Lorente filed identical motions, and this order equally pertains to all three cases.
[2] This Court is also assigned *United States v. Michaud*, No. 3:15-5351-RJB (W.D.Wash. 2016), a companion case arising from the same FBI investigation. The presentation in these cases overlap with the showing in *Michaud*, but different and additional presentations have been made here.

After logging in, registered users would view a page with hyperlinks to forum topics, the clear majority of which advertised child pornography. Dkt. 37-1. at ¶¶14-18. Website A operated on the Tor network, a publicly available alternative internet service that allows users to mask identifying information, such as Internet Protocol ("IP") addresses. *Id*. at ¶¶9, 10.

**B.  The Network Investigating Technique (NIT)**

With Website A under its control, on February 20, 2015, the FBI submitted a warrant application to authorize use of a Network Investigating Technology (NIT). Dkt. 37-1. To explain how the NIT works, the Government has offered the declaration and testimony of Dr. Brian Levine. Dkts. 58-1, 102. Defendants have incorporated the declaration of four experts, Vlad Tsyklevich, Matthew Miller, Robert Young, and Shawn Kasal. Dkts. 31-2, 31-3, 31-4, 31-5.  Mr. Tsyklevich explained how the NIT works as follows:

> The NIT presented by the FBI works by using an "exploit," a piece of software that takes advantage of a software "vulnerability" in the Tor Browser program. By exploiting this software vulnerability, the NIT is able to circumvent the security protections in the Tor Browser, which under normal circumstances, prevents web sites from determining the true IP address or MAC address of visitors. After exploiting the vulnerability, the NIT delivers a software "payload," a predetermined set of actions, to computers that receive the payload (the "host computer"). The payload used by the FBI in this case collected and then transmitted identifying information about the host computer (including its IP address) along with a unique "identifier" used to associate the target with the identifying information that the NIT collects.

Dkt. 31-2 at ¶4. According to Mr. Tsyklevich, the NIT has four primary components:

> a. Software that generates a payload and injects a unique identifier into it.
>
> b. The "exploit" that is sent to the target computer to take advantage of a software flaw in the Tor Browser.
>
> c. The "payload" that is run on the target computer to extract identifying information about it (such as its IP address).
>
> d. An additional "server component" that stores and preserves the extracted information and allows investigators to access it.

*Id.*

## C. The NIT warrant

The FBI submitted the February 20, 2015 warrant application in the Eastern District of Virginia to Magistrate Judge Theresa Buchanan. According to the warrant application, the NIT causes "activating computers" to "transmit certain information to a computer controlled by or known by the government . . . that may assist in identifying the user's computer, its location, and the user of the computer." Dkt. 37-1 at 33.

The face sheet to the NIT Warrant expressly incorporates two attachments and reads as follows:

An application by a federal law enforcement officer . . . requests the search of the following person of property located in the ____Eastern____ District of ____Virginia____ (*identify the person or describe the property to be searched and give its location*):

See Attachment A

The person or property to be searched, described above, is believed to conceal (*identify the person or describe the property to be seized*): See Attachment B[.]

Dkt. 37-2 at 1.

Attachment A reads as follows:

<u>Attachment A</u>

Place to be Searched

This warrant authorizes the use of a network investigative technique ("NIT") to be deployed on the computer server described below, obtaining information described in Attachment B from the activating computers below.

The computer server is the server operating the Tor network child pornography website referred to herein as the TARGET WEBSITE, as identified by its URL – [omitted]— which will be located at a government facility in the Eastern District of Virginia.

The activating computers are those of any user or administrator who logs into the TARGET WEBSITE by entering a username and password. The government will

not employ this network investigative technique after 30 days after this warrant is
authorized, without further authorization.

Dkt. 37-2 at 2.

Attachment B reads as follows:

<u>Attachment B</u>

Information to be Seized

From any "activating" computer described in Attachment A:

1. the "activating" computer's actual IP address, and the date and time that the
   NIT determines what that IP address is;
2. a unique identifier generated by the NIT (e.g., a series of numbers, letters, and/or
   special characters) to distinguish data from that other "activating" computers, that
   will be sent with and collected by the NIT;
3. the type of operating system running on the computer, including type (e.g.,
   Windows), version (e.g., Windows 7), and architecture (e.g., x 86);
4. information about whether the NIT has already been delivered to the "activating"
   computer;
5. the "activating" computer's Host Name;
6. the "activating" computer's active operating system username; and
7. the "activating" computer's media access control ("MAC") address;

Dkt. 37-2 at 3.

**D.  Deployment of the NIT**

For approximately 14 days, from February 20, 2015 through March 4, 2015, the FBI

administered Website A from a government-controlled computer server located in Virginia,

which forwarded a copy of all website communications to FBI personnel in Linthicum,

Maryland. Once deployed by the Government, the NIT gathered approximately nine thousand

IP addresses, approximately seven thousand of which were associated with computers in one of

more than one-hundred countries other than United States. Dkt. 90-1 at 3, 5. The FBI maintains

that it did not post content itself, but concedes that it allowed registered users to access the site,

view and download child pornographic content for distribution, and post new content,

including 44 "new" series of data. *Id*. at 3. Some website users commented on technical

improvements to the site while under FBI control. Dkt. 90-3. A NIT has been relied on by the

FBI in at least twenty-three other investigations. Dkt. 100.

**E. Local warrants**

Based on IP addresses and other identifying information gathered by use of the NIT,

officers used databases and other law enforcement tools to develop probable cause to search

Defendants' home residences and vehicles. *See generally*, Dkt. 37-3.[3] Warrants were issued by

a magistrate judge in the Western District of Washington to search addresses within this

district. *Id*. Execution of the local warrants resulted in the seizure of computers and other

media devices found to contain child pornography, and allegedly belonging to Defendants.

**F. Procedural history and motions**

All three defendants are charged in Count I with receipt of child pornography, and in

Count II with possession of child pornography. *United States v. Tippens*, 3:16-cr-05110-RJB at

Dkt. 15; *United  States v. Lesan*, 3:15-cr-000387-RJB at Dkt. 13; *United States v. Lorente*,

3:15-cr-00274-RJB at Dkt. 11. *See* 18 U.S.C. § 2252 (a)(2), (b)(1) (receipt) and (a)(4), (b)(2)

(possession).

In Defendants' Motion to Dismiss, Defendants argue that dismissal is warranted based

on outrageous government conduct. Dkt. 32.

Defendants' Motion to Suppress challenges the NIT Warrant on two primary grounds:

(1) lack of probable cause, and (2) violations of the United States Magistrate Judges Act, 28

U.S.C. § 636, and Fed. R. Crim. P. 41(b). Dkt. 35.

---

[3] The affidavit cited to is particular only to Defendant Tippens, *see* Dkt. 37-3, but Defendants have consolidated
their arguments and make no effort to distinguish one affidavit from another.

In Defendants' Motion to Exclude, Defendants argue that if they are denied the opportunity to review the NIT code in its entirety, the Court should exclude all evidence derived from the NIT code, including evidence found on the computers seized by law enforcement. Dkt. 31. The Government has provided to Defendants "one component of the payload." Dkt. 31-2 at ¶5. At oral argument held on October 31, 2016 and November 1, 2016, the parties agreed that the Government has more recently provided some portions of other components, although the parties have differing views on the significance of the material provided. Dkt. 102 at 11, 12.

To bolster its formal objection to turning over the entire NIT code, the Government requested the opportunity to conduct a CIPA §4 *ex parte*, *in camera* hearing. Dkt. 86 at 2. The Government also requested the opportunity to explain at that hearing why it should not be required to produce discovery responsive to two discovery requests, Request #5 and Request #8, which were the subject of two prior discovery orders. *Id*. *See* Dkts. 54, 80, 81. The Court granted the request for the CIPA § 4 hearing. Dkt. 95. On October 31, 2016, following the Government's *ex parte* and *in camera* presentation, the Court found that, based on the showing made, the Government was not required to disclose the remaining NIT code or discovery responsive to Request #5 or Request #8. Dkt. 102 at 116.

The Court also granted the Government's request to conduct a CIPA § 2 pretrial hearing. Dkt. 95 at 2. *See* Dkt. 86 at 2. At hearings held on October 31, 2016 and November 1, 2016, Defendants offered no evidence to supplement the written record.

The Government offered to stipulate for trial purposes that an exploit can make changes to security settings that would allow a third party to run commands on a computer without the computer user's knowledge. Dkt. 103 at 65, 66. No stipulation was reached. *Id*. at 71.

## II.     DISCUSSION

**A.  Motion to Dismiss (based on outrageous conduct)**

It is easy to conclude that the Government acted outrageously here:

(1)     The Government ignored the statute forbidding such conduct:  "In any criminal proceeding, any property or material that constitutes child pornography . . . shall remain in the care, custody and control of either the Government or the Court."  18 U.S.C § 3509(m).

(2)     The Government facilitated the continued availability of Website A, a site containing hundreds of child pornographic images for criminal users around the world.

(3)      The Government, in fact, improved Website A's technical functionality.

(4)     The Government re-victimized hundreds of children by keeping Website A online.

(5)     The Government used the child victims as bait to apprehend viewers of child pornography without informing the victims and without the victims' permission—or that of their families.

(6)     The Government's actions placed any lawyer involved in jeopardy for violating ABA Model Rules of Professional Conduct 8.4, and raise serious ethical and moral issues for counsel. *See also*, Washington Rules of Professional Conduct 8.4.

The only justification for the acts of the Government, as provided by counsel, is that the end justifies the means, or in the Government's words, "Because those who create, obtain, trade, distribute and profit from the imagery of the rape and sexual exploitation of children have turned to Tor in an effort to hide their activities, the United States has been forced to

ORDER
(*United States v. Tippens, et al.*) - 8

employ creative means to unmask the individuals engaging in the destructive and heinous criminal conduct."  Dkt. 101 at 3.

Nevertheless, dismissal of criminal charges due to outrageous conduct by the Government requires consideration of much more than the requisite conduct. "Dismissing an indictment for outrageous conduct . . . is limited to extreme cases in which the defendant can demonstrate that the government's conduct violates fundamental fairness," which is "an extremely high standard." *United States v. Black*, 733 F.3d 294, 302 (9th Cir. 2013) (internal quotations and citations omitted). Under *Black*, "there is no bright line" test to determine whether law enforcement's conduct is outrageous, but the following factors should be considered: (1) known criminal characteristics of the defendants; (2) individualized suspicion of the defendants; (3) the government's role in creating the crime of the conviction; (4) the government's encouragement to commit the offensive conduct; (5) the nature of the government's participation in the offense conduct; and (6) the balance between the nature of the crime and the necessity of the conduct. *Id*. at 303.

*Black* has provided examples of the types of cases where dismissal is warranted:

> It is outrageous for government agents to engineer and direct a criminal enterprise from start to finish . . . to use excessive physical or mental coercion to convince an individual to commit a crime [and] . . . to generate new crimes merely for the sake of pressing criminal charges.

*Id*. (internal quotations and citations omitted). Conversely, under *Black*, it is not outrageous conduct "to infiltrate a criminal organization, to approach individuals who are already involved in or contemplating a criminal act . . .  to provide necessary items to a conspiracy. . . [or]  to use artifice and stratagem to ferret out criminal activity." *Id.* at 303 (internal quotations and citations omitted).

Applying the *Black* factors: (1) the Government did not know the criminal characteristics of any defendant; (2)  the Government had no individualized suspicion of any defendant; (3) the Government created an opportunity for others to commit the crimes charged, but did not create the crimes charged; (4) the Government did not encourage the crimes charged—only provided the opportunity to persons unknown; (5) the nature of the Government's participation was only to provide an opportunity to commit the crimes charged; and (6) reasonable minds can differ over the balance between the nature—and potential number—of the crimes charged and the necessity for the Governmental conduct, as reflected in the Government's justification for its conduct.

Considering the totality of the circumstances, Defendants have not shown that dismissal based on outrageous government conduct is warranted. Defendants' motion to dismiss should be denied.

## B.  Motion to Suppress

Defendants' motion to suppress challenges the NIT Warrant in two primary ways: (1) lack of probable cause, and (2) violations of the United States Magistrate Judges Act, 28 U.S.C. § 636, and Fed. R. Crim. P. 41(b).

### 1.   *Probable cause*

The Fourth Amendment prohibits "unreasonable searches and seizures" and requires that "no warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched and the persons or things to be seized." U.S.Const. Amend. IV. Whether a warrant is supported by probable cause is a totality of the circumstances test that relies on common sense, where the magistrate judge weighs whether there is a "fair probability" that contraband or evidence will be found in a particular place.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

*United States v. Gourde*, 440 F.3d 1065, 1069 (9th Cir. 2006), citing *Illinois v. Gates*, 462 U.S. 213, 214 (1983).

Defendants argue that the NIT Warrant lacks probable cause because it did not describe with particularity how Website A "unabashedly announce[d]" that it was an illegal child pornography site, and that the NIT Warrant amounts to an invalid anticipatory warrant. Dkt. 35 at 27-32. Neither argument is persuasive. First, the FBI affiant provided sufficient detail for a reasonable magistrate judge to conclude that Website A was an illegal child pornography site. The FBI affiant described in detail the homepage, which featured two prepubescent, partially-clothed females, as well as text instructing users how to post photos and video material. Dkt. 37-1 at ¶¶12, 13. The website was not publicly available and could be found only by using a Tor hidden service. *Id*. at ¶¶6-9. The FBI affiant described the items to be gathered by use of the NIT, which, for a period of 30 days, was authorized to be deployed only against registered users of the child pornography site. *Id*. at ¶34. When weighing the totality of the circumstances, the NIT Warrant does not fail for lack of probable cause, especially because the magistrate judge was permitted to rely on the conclusions of the FBI affiant about "where evidence is likely to be found." *United States v. Terry*, 911 F.2d 272, 274 (9th Cir. 1990). *See* Dkt. 37-1 at ¶¶6-37. The fact that the homepage was changed from two prepubescent females to one youthful female between the time that the FBI affidavit was prepared and when the NIT Warrant was issued is immaterial to this conclusion.

Second,  although the NIT Warrant may be an anticipatory warrant, as in *United States v. Gourde*, 440 F.3d 1065, 1071 (9th Cir. 2006), the NIT Warrant in this case did not seek to inculpate the "unwitting[], or even passive[]" site visitor. The NIT Warrant was not triggered until a person had logged onto a website with a homepage that prominently displayed an

underage, under-clothed female. Unlike the website in *Gourde*, which could be found with a Google search of a word, "Lolita," *id.*, Website A could not be found by use of a Google search and instead required knowledge of the exact address, which was extremely unlikely to be stumbled on. Dkt. 37-1 at ¶10. The NIT Warrant does not fail for lack of probable cause.

### 2.   *28 U.S.C. § 636*

Defendants argue that the NIT Warrant is void because it violated 28 U.S.C. § 636, a violation distinct from the Rule 41(b) violation (discussed below). Dkt. 35 at 2. The United States Magistrates Act, codified at 28 U.S.C. §§ 631-639, provides:

> (a) Each United States magistrate judge . . . shall have <u>within the district</u> in which sessions are held by the court that appointed the magistrate judge, at other places where that court may function, <u>and elsewhere as authorized by law</u>—
>> (1) all powers and duties conferred or imposed upon United States commissioners by law or by the Rules of Criminal Procedure for the United States District Courts[.]

28 U.S.C. § 636(a) (emphasis added).

Section 636 and Rule 41(b) have nearly identical language, and § 636 incorporates Rule 41(b), *see* § 636(a)(1), so it is not clear that § 636 violations should be analyzed separately from Rule 41(b) violations. *Compare* § 636 (". . . magistrate judge[s] shall have within the district . . . all powers and duties conferred . . . by the Rules of Criminal Procedure"); *and* Fed. R. Crim. P. 41(b)(1) ("a magistrate judge with authority in the district . . . has authority to issue a warrant to search for . . . property located within the district"). Other courts have unified the analysis, which may be a better way to reconcile the two rules. *See, e.g.,United States v. Broy*, 2016 WL 5172853, at *6 (C.D. Ill. Sept. 21, 2016). Nonetheless, analyzing the NIT Warrant through the lens of § 636, it was lawful for the magistrate judge to authorize deployment of the NIT to search computers within her district, which may have been her intent, but deployment of the NIT resulted in the search of Defendants' computers in the Western District of

Washington and elsewhere, which exceeded the boundaries of the magistrate judge's jurisdiction.

To the extent that the NIT Warrant authorized the search of computers outside of the Eastern District of Virginia, the NIT Warrant violated § 636.

### 3.  *Fed. R. Crim. P. 41(b)*

Fed. R. Crim. P. 41(b)(1), which has the force of a statute, *see* 18 U.S.C. § 3103, sets out the general rule that "a magistrate with authority in the district . . . has the authority to issue a warrant to search for and seize a person or property located within the district." The rule also carves out exceptions, two of which apply, according to the Government: (1) subdivision (b)(2), where a person or property "might move or be moved outside the district before the warrant is executed," and (2) subdivision (b)(4), which authorizes "install[ing] within the district a tracking device . . . to track the movement of a person located within the district, outside the district, or both[.]" Rule 41(b) is to be applied flexibly, not rigidly, especially as to technology. *United States v. Koyomejian*, 970 F.2d 536, 542 (9th Cir. 1992). In *United States v. New York Tel. Co.*, 434 U.S. 159 (1977), the court noted that a flexible reading of the rule is reinforced by Fed. R. Crim. P. 57(b), which provides that in the absence of controlling law, "a judge may regulate practice in any manner consistent with federal law, these rules and the local rules[.]" *Id.*, at 170.

Rule 41 subdivisions (b)(2) and (b)(4) did not authorize the search of computers in the Western District of Washington or elsewhere beyond the magistrate judge's district. To so interpret those rules appears to stretch their plain language far beyond their intent. Even when flexibly applying the rule, the NIT Warrant violated the letter of Rule 41(b).

Having determined that the NIT Warrant violates Rule 41(b), the next issue is whether the violation was fundamental or technical. "Fundamental errors are those that result in clear constitutional violations," which warrant suppression. *United States v. Negrete-Gonzales*, 966 F.2d 1277, 1283 (9th Cir. 1992) (internal citations omitted). Technical errors warrant suppression only if: (1) there is evidence of deliberate disregard of the rule, or (2) the defendants were prejudiced by the error "in the sense that the search would not have occurred . . . if the rule had been followed or would have been less intrusive absent the error." *Id.*

Defendants argue that a fundamental violation of constitutional magnitude occurred due to the "unprecedented worldwide warrant . . . the cyber equivalent of the general warrants that were anathema to the Founders." Dkt. 74 at 15. The Court previously rejected the lack of particularity argument, finding probable cause for issuance of the NIT Warrant. *See § IIB1 above*. Defendants have not shown that the Rule 41(b) violation was fundamental.

Because the Rule 41(b) violation was not fundamental, it was technical, and suppression is warranted only if there is a requisite showing of deliberate disregard of Rule 41(b) or prejudice. *See United States v. Negrete-Gonzales*, 966 F.2d 1277, 1283 (9th Cir. 1992). Defendants' argument that the Government acted with deliberate disregard of Rule 41(b) is unavailing. As evidence of deliberate disregard, Defendants point to a Department of Justice letter to the Chair of the Advisory Committee on the Criminal Rules, Dkt. 37-8 at 1, which was sent on September 18, 2013, a date prior to when the FBI sought the NIT Warrant in this case. The DOJ letter proposed changes to Rule 41(b) to "better enable law enforcement to investigate and prosecute botnets and crimes involving Internet anonymizing technologies," because "Rule 41(b) does not directly address the special circumstances that arise . . . where the warrant sufficiently describes the computer to be searched but the district . . . is unknown."

*Id.* (emphasis added). Defendants' argument would require the Court to make inferences not required by the text of the DOJ letter. The DOJ letter reveals an intent to improve the rule, which does not rule out the possibility that DOJ could have considered Rule 41(b) sufficiently flexible to address changes in technology. *See also*, Dkt. 104-1. Furthermore, the record is silent as to the magistrate judge's thoughts regarding the scope of the warrant at the time it was issued, and speculation on that subject is fruitless.  The record does not show deliberate disregard.

Defendants also argue that Defendants were prejudiced, because "if the rule had been heeded . . . [and] the NIT searches . . . properly confined to the Eastern District of Virginia," there would have been no search of Defendants' computers. *Id.* at 10, 11. The definition of prejudice relied upon by Defendants, "in the sense that the search would not have occurred if the rule had been followed," found in *United States v. Weiland*, 420 F.3d 1062, 1071 (9th Cir. 2005), should not be construed broadly. Under Defendants' interpretation, all searches executed on the basis of warrants in violation of Rule 41(b) would result in prejudice, no matter how small or technical the error might be. Tracing the *Weiland* definition to its prior application within the Ninth Circuit, *see United States v. Vasser*, 648 F.2d 507, 511 (9th Cir. 1980), a more workable interpretation of the *Weiland* definition inquires whether evidence obtained from a warrant that violates Rule 41(b) could have been available by other lawful means, and if so, the defendant did not suffer prejudice.

Applied here, Defendants did not suffer prejudice when they revealed to a third party the key identifying information, their IP addresses, to which they had no reasonable expectation of privacy. *United States v. Forrester*, 512 F.3d 500, 510 (9th Cir. 2008). As another court within this circuit explained:

> The FBI was ultimately able to locate [the defendant] by tracking his IP address to his internet provider, demonstrating that [the defendant] voluntarily turned his IP address information over to this third party so that it could provide him with web services . . . As [the defendant] does not have an expectation of privacy in his IP address, the FBI could have legally discovered [the defendant's] IP address absent the NIT Warrant.

*United States v. Henderson*, 15-CR-00565-WHO-1 at 7 (N.D.Cal. Sept. 9, 2016). The fact that Defendants may have attempted to hide their IP addresses does not change the analysis, because the focus is on the reasonableness of, not Defendants' subjective efforts to protect, the expectation of privacy.

The Rule 41(b) violation was technical, not fundamental, and suppression is not warranted based on the violation.

### 4.  *Good faith exception*

Given the violations of Rule 41(b) and § 636, the next issue is whether the good faith exception bars application of the exclusionary rule. Determining whether to apply the good faith exception to the exclusionary rule where the warrant is issued by a detached and neutral magistrate judge "must be resolved by weighing the costs and benefits of preventing the use . . . of inherently trustworthy tangible evidence . . . that ultimately is found to be defective." *United States v. Leon*, 468 U.S. 897, 906–07 (1984) (internal citations and quotations omitted). Whether a warrant is executed in good faith depends on whether reliance on the warrant was objectively reasonable. If reliance was objectively reasonable, the good faith exception applies, because "excluding the evidence will not further the ends of the exclusionary rule" to deter police misconduct. *Id*. at 918. The determination of whether the good faith exception applies "is an issue separate" from whether constitutional rights were violated by police conduct. *Id*. at 918 (citations and quotations omitted). The exclusionary rule does not apply to deter misconduct of judges or magistrates, because "there exists no evidence suggesting that . . .

lawlessness among [judges and magistrates] actors requires application of the extreme sanction of exclusion." *Id.* at 916.

In this case, reliance on the NIT Warrant was objectively reasonable. The NIT Warrant, issued by a magistrate judge, authorized deploying the NIT from a government-controlled computer server in the Eastern District of Virginia for up to 30 days to search "activating computers." Dkt. 37-2. The NIT Warrant defined "activating computers" as computers of "any user or administrator who logs into [Website A]," from which the FBI was authorized to gather IP addresses and other identifying information. Dkt. 37-2 at 3. The FBI affiant detailed the need for the NIT, based on the nature of Website A, a child pornography site hidden on the Tor network. Dkt. 37-1 at ¶¶9-37. The FBI affiant also described the mechanics of deploying the NIT and the scope of the items to be searched and seized. *Id.* The NIT Warrant authorized solely what was requested by the FBI affiant. Dkt. 37-1 at ¶34; Dkt. 37-2 at 2, 3. Based on these facts, relying on the NIT Warrant was objectively reasonable. The record does not support a finding that the magistrate judge was misled, that the magistrate judge wholly abandoned her role as detached and neutral decisionmaker, that the warrant was issued based on a total lack of probable cause, or other grounds to reject the good faith exception. *See Leon*, 468 U.S. at 923-24.

Defendants argue that the good faith exception should not excuse the Rule 41(b) violation.  Dkt. 74 at 24, 25. Under *United States v. Negrete-Gonzales*, 966 F.2d 1277, 1283 (9th Cir. 1992), "[f]undamental errors are those that result in clear constitutional violations . . . [and] require suppression, unless the officers can show good faith reliance as required by *Leon*." *Id.* "To take advantage of *Leon*, the executing agents . . . must demonstrate an objectively reasonable basis for their mistaken belief that the warrant was valid." *Id.* (emphasis

omitted). For technical errors, suppression is required "only if: (1) the defendants were prejudiced by the error, or (2) there is evidence of deliberate disregard of the rule." *Id.* In this case the Rule 41(b) violation was technical, and as previously discussed, there has not been a showing of prejudice or deliberate disregard. Even if the Rule 41(b) violation was fundamental, because reliance was objectively reasonable, the Rule 41(b) violation need not warrant suppression.

Defendants also argue that the good faith exception does not excuse the § 636 violation, Dkt. 74 at 25, but this Court is not aware of any authority that would require exclusion of evidence where officers acted in good faith. Some courts have argued that the *Leon* good faith exception should not extend to the NIT Warrant because the warrant was void *ab initio*. *See, e.g.*, *United States v. Levin*, 2016 WL 2596010, at *10 (D. Mass. May 5, 2016). *Leon* does not make the void *ab initio* distinction urged by Defendants and the court in *Levin*. *Levin* conceded that this is an unresolved area of the law. *Id.* The NIT Warrant was not void *ab initio*, because it was valid at least as to computers within the issuing magistrate judge's district, but even if it was void *ab initio*, § 636 restricts only magistrate judges. The exclusionary rule does not apply to deter the conduct of magistrate judges, who are "neutral judicial officers [who] have no stake in the outcome of particular criminal prosecutions. *Leon*, 468 U.S. at 916-17. *See also*, *United States v. Negrete-Gonzales*, 966 F.2d 1277, 1283 (9th Cir. 1992); *Illinois v. Krull*, 480 U.S. 340, 348 (1987).

The NIT Warrant violated Rule 41(b) and § 636, but because reliance on the warrant was objectively reasonable, the good faith exception bars application of the exclusionary rule. Defendants' motion to suppress should be denied.

**C. Motion to Exclude Evidence**

Based on the Motion to Exclude (Dkt. 31) and the Motion to Compel Discovery (Dkt. 54), Defendants seek remaining discovery:

(1)  Opportunity to review the NIT code in its entirety;

(2) Request #5: "The names of all agents, contractors, or other personnel who assisted with relocating, maintaining and operating Playpen while it was under Government control"; and

(3) Request #8: "Copies of all correspondence, referrals, and other records indicating whether the exploit . . . has been submitted by the FBI . . . to the White House's Vulnerability Equities Process (VEP) and what, if any, decision was made by the VEP."

Defendants ask the Court for dismissal if the requested discovery is not provided.

While the Government has provided certain information about the NIT to Defendants, it has objected to producing the NIT code in its entirety.  The Government requested a CIPA § 4 hearing, which was conducted *ex parte* and *in camera* on the subject of the NIT and the two discovery requests. (The latter were the subjects of prior orders. *See* Dkts. 80, 81.) Following the CIPA § 4 hearing, the Court ruled that it would not compel the Government to produce any of the subject discovery. Also following the CIPA § 4 hearing, the Government suggested a substitute summary of evidence. Defense counsel appeared disinterested in that approach, and no agreement was reached and no order made. 103 at 65, 66, 71. A substitute summary is, however, still available to the parties.

The Court also granted the Government's request to conduct a CIPA § 2 pretrial hearing. Dkt. 95 at 2. *See* Dkt. 86 at 2. CIPA § 2 allows defendants and their attorneys to make admissions not later admissible at trial, 18 U.S.C. App. 3 § 2, but Defendants offered no evidence to supplement the written record.

This state of affairs leads to two issues: (1) whether the withheld material is discoverable under Fed. R. Crim. P. 16, and (2) whether the withheld material is relevant and

helpful to the defense. As discussed below, different standards apply to each issue. If the material is not discoverable, that ends the inquiry. If the discovery is material but not relevant and helpful, that too ends the inquiry. If the evidence is both material and relevant and helpful, the government will have to produce the material or face dismissal.

"Congress passed CIPA to prevent the problem of 'graymail,' where defendants pressed for the release of classified information to force the government to drop the prosecution." *United States v. Sarkissian*, 841 F.2d 959, 965 (9th Cir. 1988). CIPA permits "the trial judge to rule on questions of admissibility involving classified information before introduction of the evidence in open court. . . [which] permits the government to ascertain the potential damage to national security of proceeding with a given prosecution." *Id*. (internal citations omitted). CIPA should not be interpreted to "expand or restrict established principles of discovery . . . [or to] have a substantive impact on the admissibility of probative evidence." *United States v. Sedaghaty*, 728 F.3d 885, 903 (9th Cir. 2013) (internal citations omitted). Instead, CIPA "clarif[ies] the court's powers . . . to deny or restrict discovery in order to protect national security." *Id*. at 904.

CIPA § 2 gives parties the option to move for a pretrial conference "to consider matters relating to classified information that may arise in connection with the prosecution." 18 U.S.C. App. 3 § 2. At this hearing, "the court may consider any matters which relate to classified information or which may promote a fair and expeditious trial," and to that end, "[n]o admission made by the defendant or by any attorney for the defendant . . . may be used against the defendant unless . . . in writing and [] signed[.]" *Id*.

CIPA § 4 provides that the Government may request an *ex parte* hearing to make a showing that, if sufficient, "may authorize the United States to delete specified items of

classified information from documents to be made available to the defendant through discovery under the Federal Rules of Criminal Procedure[.]" 18 U.S.C. App. 3 § 4. That section also authorizes the Government "to substitute a summary of the information for such classified documents, or to substitute a statement admitting relevant facts that the classified information would tend to prove." *Id.*

*Sedaghaty* sets out the three-step analysis for CIPA § 4 motions. First, "a district court must first determine whether, pursuant to the Federal Rules of Criminal Procedure, statute, or the common law, the information at issue is discoverable at all." *United States v. Sedaghaty*, 728 F.3d 885, 904 (9th Cir. 2013). Second, the court must "determine whether the government has made a formal claim of the state secrets privilege, lodged by the head of the department which has actual control over the matter, after actual personal consideration by that officer." *Id.* Third, the court must consider whether the evidence is "relevant and helpful to the defense of an accused,'" *id.*, quoting *Roviaro v. United States*, 353 U.S. 53, 60-61 (1957), and if so, "CIPA § 4 empowers the court to determine the terms of discovery, <u>if any</u>." *Id.* (emphasis added).

1. *Discoverable?*

Under Fed. R. Crim. P. 16(a)(1)(E), the Government is required to produce discovery that is "within the government's possession, custody, or control and . . . is material to preparing the defense." The term "defense" refers to discovery that would "refute the Government's arguments that the defendant committed the crime charged . . . [including] discovery related to the constitutionality of a search or a seizure." *United States v. Soto Zuniga*, __F.3d__ 2016 WL 4932319 (9th Cir. 2016). The NIT code and other requested discovery is discoverable under

1   Fed. R. Crim. P. 16(a)(1)(E) because of its potential bearing on Defendants' motions, including

2   the constitutional challenges to the NIT Warrant.

3          2.   *State secrets privilege?*

4          Based on the Government's filing (Dkt. 86), which invoked a formal claim of privilege,

5   the Court issued a sealed order, the Order Setting [Section 2] Pretrial Conference, Appointing

6   [Classified Information Security Officer], and Granting Leave to File Section 4 Pleading. Dkt.

7   95. Following the *ex parte* and *in camera* hearing and filings, the Court previously

8   concluded—and now reaffirms its conclusion—that the Government made a sufficient showing

9   to justify withholding the remaining portions of the NIT code and other discovery from

10  Defendants.

11         3.   *Relevant and helpful?*

12         There is limited Ninth Circuit case law to guide courts in conducting the *Roviaro*

13  relevant and helpful inquiry, but another District Court in the Ninth Circuit has analyzed the

14  issue at length. *See United States v. Turi*, 143 F.Supp.3d 916, 920 (D.Ariz. 2015). This Court

15  joins the *Turi* court in interpreting "relevant and helpful" to mean that the Government must

16  disclose information—or face dismissal—"only if there is a reasonable probability that, had the

17  evidence been disclosed to the defense, the result . . . would have been different." *Id*. at 921,

18  quoting *Klimavicius-Viloria*, 144 F.3d 1249, 1261 (9th Cir. 1998). *See also*, *Kyles v. Whitley*,

19  514 U.S. 419, 436-37 (1995) (right to fair trial not violated "every time the government . . .

20  chooses not to disclose evidence that might prove helpful"). As *Turi* explained, this standard

21  "ensure[s] that a defendant will not be denied a fair trial for national security reasons, while

22  requiring disclosure of classified information only when truly necessary—when the classified

23  information would affect the result of the proceeding." *Id*. To interpret the standard otherwise

would, for all practical purposes, conflate the discoverable inquiry with the relevant and helpful inquiry, depriving the Court of any meaningful discretion to balance the Government's interest in protecting classified national security information with Defendants' interest in accessing pretrial discovery.

The Court is reluctant to make a "relevant and helpful" finding under CIPA § 4. To do so, the Court must attempt to place itself in the shoes of defense counsel and examine the evidence *ex parte* and *in camera* to determine the effect of the evidence on the defense case, if any. Substituting a judge's mind for the fertile minds of defense counsel presents obvious risks to due process and a fair trial. Nevertheless, in rare cases such as this one, it must be done.

At oral argument, Defendants referred to their experts' declarations, which Defendants contend articulate why the Government must produce the entire NIT code. Dkt. 102 at 11; Dkt. 103 at 7, 8, 14-16. The Court now turns to three rationales offered in the declaration of Mr. Tyrklevich, whose declaration is the most detailed of Defendants' four expert declarations, *see* Dkts. 31-2, 31-3, 31-4, 31-5, and a fourth rationale emphasized at oral argument, *see* Dkt. 31-3 at ¶2, to determine whether the full NIT code, and other requested discovery, is relevant and helpful to Defendants.

> (1) *The software that generates a payload and injects a unique identifier into it (component "a") is <u>critical to understanding whether the unique identifier used to link a defendant to access of illegal content is actually unique. If the identifier is generated incorrectly, it could cause different users to be incorrectly linked to each other's actions</u> . . . Without the missing data, I am unable to make a determination about these issues.* Dkt. 31-2 at ¶6 (emphasis added).

Assuming that "different users [were] incorrectly linked to each other other's actions," that would result in the transmission to the FBI of incorrect payload information. Then the unique identifier would not necessarily correspond to the correct IP address or other identifying information. The local search warrants relied on the identifying information, so if incorrect,

this would at worst would result in the search of the wrong home, which would not affect Defendants here. *See United States v. Turner*, 770 F.2d 1508 (9th Cir. 1985) (warrant is sufficiently particular absent a showing of any reasonable probability that another premise might be mistakenly searched); *United States v. Mann*, 389 F.3d 869, 876 (9th Cir. 2004) ("the practical accuracy [of the search warrant] rather than the technical precision governs"). Officers relied on the identifying information in good faith. *C.f. United States v. Collins*, 830 F.2d 145 (9th Cir. 1987) (search of wrong address due to carelessness and lack of common prudence). Furthermore, the search of Defendants' homes was premised not on absolute certainty, but rather on a finding of probable cause, which is a "commonsense, practical question," *United States v. Kelley*, 482 F.3d 1047, 1050 (9th Cir. 2007), and the theoretical possibility of an incorrect unique identifier, which would result in the pursuit of an investigation at the wrong address would not undermine the linchpin of probable cause.

> (2) . . . *Analyzing and understanding the exploit component of the NIT is <u>critical to understanding whether the payload data</u> that has been provided in discovery <u>was the only component executing and reporting information to the government or whether the exploit executed additional functions outside of the scope of the NIT warrant.</u> Without the missing data about the exploit component of the NIT, I am unable to make a determination about these issues.* Dkt. 31-2 at ¶6 (emphasis added).

This rationale theorizes that the NIT, as deployed, may have exceeded the scope of the NIT Warrant as authorized, but Defendants offer nothing to support this theory beyond speculation. A careful review of the affidavits  underlying the local warrants shows reliance on the NIT only for identifying information, such as IP addresses, that fall within the scope of the NIT Warrant. *See* Dkt. 37-3 at 79-82, ¶¶28-42. Even if the NIT "executed additional functions" not authorized by the warrant, the remedy would be to suppress unlawfully-gained evidence, not to suppress lawfully-obtained evidence that formed the basis for the local warrants. *See United States v. Payton*, 573 F.3d 859, 864 (9th Cir. 2009).

*(3) In addition, the server component that stores the identifying information returned by the payload (component "d") must faithfully store and reproduce the data it was sent. . . [A]nalyzing this component of the NIT [is] essential to understanding and verifying the digital "chain of custody" of information derived from the NIT. . . [or] I am unable to make a determination about these issues. Dkt. 31-2 at ¶6 (emphasis added).*

This rationale fails even under the assumption that there was an interruption to the "digital chain of custody" between Defendants' computers and the FBI server that stored the information gathered from deployment of the NIT. If there was an interruption, by a hacker, for example, it would at worst corrupt the "identifying information returned by the payload" used to execute local warrants. That would not be fatal to the warrants, especially where officers relied on the identifying information in good faith. *See subsection (1) above*.

The digital chain of custody argument theoretically has more bearing on the charge against Defendants for <u>receipt</u> of child pornography, depending on how the Government elects to show the "knowing receipt" of child pornography. The Government denies the need to rely on any NIT information at trial, but Defendants are justifiably wary of this representation. As to both counts, however, Defendants' argument suffers from the same problem, namely, that Defendants have provided only speculation, not facts, to support their argument.

(4) *Vulnerability to a third party attack that "planted" child pornography on Defendants' computers and compromised computer security settings*. Dkt. 31-3 at ¶2.

Defendants argue that analyzing the remainder of the NIT code, and the exploit in particular, is necessary to determine whether a third party could have accessed Defendants' computers to "plant" the child pornography. Declarations by Defendants' experts contend that this is a real possibility. Dkt. 31-3 at ¶2. However, when pushed by the Government to make a stronger showing beyond arguing that such a third party attack is theoretically possible,

Defendants argued that they are in a "Catch-22" dilemma, because they cannot make a further showing without review of the NIT code that they seek.

Defendants' "apparent Catch-22 is more apparent than real." *United States v. Yunis*, 867 F.2d 617, 624 (D.C. Cir. 1989). Defendants have concededly not conducted forensic investigations of computers seized by law enforcement, and according to the Government, conducting an investigation of the computers, along with the portions of the NIT code already disclosed, would be sufficient to determine third party vulnerability. Defendants insist that they should not need to rely on the Government's representation, but again, Defendants have submitted no factual evidence beyond the theoretical.

For all four rationales raised, but perhaps especially so for the fourth rationale, Defendants' lack of showing is particularly problematic when Defendants had a unique chance for a free bite of the proverbial apple. Under CIPA § 2, Defendants have the chance to make admissions to the Court not admissible against them at trial. *See* 18 U.S.C. App. 3 § 2 ("No admission made by the defendant or by any attorney for the defendant . . . may be used against the defendant unless . . . is in writing and is signed by the defendant and [his] attorney"); FRE 801(d)(2).  Defendants did not avail themselves of the opportunity. Such a showing may have moved their argument beyond the theoretical, but the Court is otherwise left with Defendants' mere speculation.

The CIPA § 4 *ex parte* and *in camera* hearing did not reveal any information to persuade the Court that production of the entire NIT would change the probability of a different outcome beyond Defendants' speculation.

The Court finds that disclosing the NIT code in its entirety would not be relevant and helpful to the defense. Although Defendants provide persuasive arguments in the abstract,

upon close examination, and in light of the record provided, Defendants have not shown the reasonable probability of a different outcome if the NIT is produced in its entirety. The remaining NIT code, though discoverable as material under Fed. R. Crim. P. 16(a)(1)(E), is not relevant and helpful to the defense under *Roviaro* and *Sedaghaty* and need not be disclosed to Defendants.

**D.  Third Order on Defendants' Motion to Compel Discovery**

The Court previously found the information requested by Request #5 to be discoverable and the Government's privilege showing to be sufficient (Dkts. 80, 81), so the sole issue as to Request #5 is whether the requested discovery is relevant and helpful.  *See United States v. Turi*, 143 F.Supp.3d 916, 920 (D.Ariz. 2015); *Roviaro v. United States*, 353 U.S. 53, 60-61 (1957). The Government's *ex parte* and *in camera* presentation revealed to the Court nothing that would change the probability of a different outcome of dispositive motions or trial.  The Court finds that the requested information pertaining to Request #5 is not relevant and helpful to the defense, and its production should not be compelled.

Production of the subject matter of Request #8 should likewise not be compelled. Even if the Court assumes that the requested information is discoverable and that the Government's privilege showing is sufficient, the requested information pertaining to Request #8 is not relevant and helpful to the defense. Production of the requested information should not be compelled.

Not only do Defendants base their request for the NIT information, Request #5, and Request #8 on speculation, but also the Court's examination of the evidence—from the file contents, from public hearings, and from *ex parte* and *in camera* hearings—leads to the conclusion that there is no evidence or information in what the Government may withhold that

would be relevant or helpful to Defendants, that is, there is not a reasonable probability of a different outcome if the material were disclosed to Defendants.

\* \* \*

## IV. CONCLUSION

The new technology used to investigate Defendants presents unique constitutional and statutory challenges. As the Court previously noted in *Michaud*, "[t]he Fourth Amendment incorporates a great many specific protections against unreasonable searches and seizures. The contours of these protections in the context of computer searches pose difficult questions." *United States v. Adjani*, 452 F.3d 1140, 1152 (9th Cir. 2006)(internal quotations and citations omitted). The Government's conduct cannot be condoned, but the charges were not dismissible as outrageous. The Government did not violate search and seizure standards enshrined in the United States Constitution. The NIT Warrant violated Rule 41(b) and § 636, but reliance on the warrant was objectively reasonable, and Defendants' speculation about what the remaining NIT code could show does not change the outcome here.

\* \* \*

THEREFORE, it is HEREBY ORDERED:

(1) As to *United States v. Tippens*, 3:16-cr-05110-RJB:

- ▪ Defendants' Motion to Dismiss Indictment (Dkt. 32) is DENIED.

- ▪ Defendants' Motion to Suppress Evidence (Dkt. 35) is DENIED.

- ▪ Defendants' Motion to Exclude Evidence (Dkt. 31) is DENIED.

- ▪ Production of the information requested in Defendants' Motion to Compel Discovery in Request #5 and Request #8 (Dkt. 54) shall not be compelled.

(2) As to *United States v. Lesan*, 3:16-cr-00387-RJB:

- Defendants' Motion to Dismiss Indictment (Dkt. 82 ) is DENIED.

- Defendants' Motion to Suppress Evidence (Dkt. 85) is DENIED.

- Defendants' Motion to Exclude Evidence (Dkt.81) is DENIED.

- Production of the information requested in Defendants' Motion to Compel Discovery in Request #5 and Request #8 (Dkt. 100) shall not be compelled.

(3) As to *United States v. Lorente*, 3:15-cr-00274-RJB:

- Defendants' Motion to Dismiss Indictment (Dkt.  95) is DENIED.

- Defendants' Motion to Suppress Evidence (Dkt.98) is DENIED.

- Defendants' Motion to Exclude Evidence (Dkt.94) is DENIED.

- Production of the information requested in Defendants' Motion to Compel Discovery in Request #5 and Request #8 (Dkt. 113) shall not be compelled.

DONE this 30th day of  November, 2016.

ROBERT J. BRYAN
United States District Judge